**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

**CHRISTOPHER JOHNSON,**

                              **Plaintiff,**

**v.**

                                                          **20-CV-604-JLS(HKS)**

**PAUL CHAPPIUS, JR., GREGORY KELLER,**
**TIMOTHY CARROLL, MICHAEL RANDALL,**
**EDWARD WOLF, STEVEN PACIOREK, and**
**KYLE RAMIREZ,**

                              **Defendants.**

---

## REPORT, RECOMMENDATION, AND ORDER

        This case was referred to the undersigned by the Hon. John L. Sinatra, Jr.,

pursuant to 28 U.S.C. § 636(b)(1), for all pretrial matters and to hear and report upon

dispositive motions. Dkt. #8. Plaintiff brings this civil rights action pursuant to 42 U.S.C.

§ 1983 seeking relief for the alleged violation of his rights under the First, Eighth, and

Fourteenth Amendments to the United States Constitution. Dkt. #1.


        Currently before the Court is defendants' motion for summary judgment.

Dkt. #33. For the following reasons, it is recommended that the motion be granted.


## BACKGROUND

        Plaintiff Christopher Johnson was an inmate in the custody of the New York

State Department of Corrections and Community Supervision ("DOCCS") at the Elmira

Correctional Facility ("Elmira") in 2017, including a sixty-one-day period from August to

October 2017 when he was held on contraband watch. Dkt. #1, ¶ 2; #46-1, ¶¶ 1-2.

### *August 4, 2017: Plaintiff is Placed on Contraband Watch*

On August 4, 2017, plaintiff was seen in the Elmira infirmary for an Asthma Interim Visit. Doc. #34-1, pp. 2-3. He told the nurse practitioner that he was having back spasms, so he was sent for an x-ray.  Dkt. #45-1, p. 14-15.[1] The medical staff told plaintiff that the x-ray showed what appeared to be a metal object in his lower rectum. Dkt. #45-1, p. 19.

Nurse Jill Northop reported this information to defendant Sergeant Charles Rumsmoke.[2] Dkt. #33-6, p. 20. Northrop told Rumsmoke that the object on the x-ray appeared to be a "razor-type weapon." Dkt. #33-10, p. 12.[3] Rumsmoke reported this information to the Watch Commander, who instructed Rumsmoke to place plaintiff on one-on-one contraband watch. Dkt. #33-6, p.21. Defendant Gregory Keller, the Deputy Superintendent for Security, authorized the special watch. Dkt. #33-8, p. 1; #Dkt. 33-1, ¶ 9.

The contraband watch rooms are located on the second floor of the Elmira infirmary. Dkt. #33-4, p. 5; Dkt. #33-5, p. 7. If the room has a sink and toilet, the water is shut off and the toilet is disabled so that it cannot be used to dispose of contraband. Dkt. #45-6, p. 26; Dkt. #33-5, p. 9-10; Dkt. #33-6, p. 7. If the inmate needs to urinate, he must

---

[1] Dkt. #45-1 is the transcript of plaintiff's deposition.

[2] Rumsmoke is incorrectly named "Rummell" in the complaint, which plaintiff concedes. Dkt. #46-1, p. 3.

[3] The August 4, 2017 x-ray images are found at Dkt. #37, pp. 1-2. The subsequent review of the x-ray by a radiology consultant in Potsdam, New York states: "Impression: Metallic foreign object in the region of the rectum." Dkt. #34-2, p.1.

request a urinal bottle from a guard, and if he needs to defecate, he is given a bedpan. Dkt. #33-3, p. 9; Dkt. #45-6, p. 26. The inmate urinates or defecates in front of the guards, who then inspect the urine or feces for contraband. Dkt. #45-1, p. 20; Dkt. #45-6, p. 26; Dkt. #33-6, p. 8.

The contraband watch rooms have a window so that guards can observe the inmate around the clock. Dkt. #45-6, p. 27. The guards keep a logbook and make entries every 15 minutes regarding the inmate's activity, *i.e.*, whether he is sleeping, awake, sitting, standing, eating, etc. Dkt. #45-6, p. 27; Dkt. #33-6, p. 28. They also document when the inmate urinates or defecates. Dkt. #33-5, p. 14-15.

Inmates on contraband watch are given a smock to wear. Dkt. #35, ¶ 6; Dkt. #33-6, p. 11. Plaintiff testified that he was given such a smock but no underwear, pants, or shirt. Dkt. #45-1, p. 24. Inmates also receive paper slippers to wear when they leave the watch room. Dkt. #33-6, p. 16. Plaintiff testified that he had a bed until it was taken away after an incident which is discussed below, and that he "could not recall" if he always had a mattress. Dkt. #45-1, p. 26.

Inmates on contraband watch are not allowed to shower but they may request personal hygiene items to wash themselves and brush their teeth. Dkt. #33-5, pp. 24-25. Plaintiff testified in his deposition that he was never given soap and water while on contraband watch and that he brushed his teeth only once. Dkt. #45-1, pp. 28-29. However, the logbook of plaintiff's contraband watch reflects that plaintiff was provided

hot water and soap on five occasions, Dkt. #33-8, pp. 40, 74, 101, 104, 165, and toothpaste and a toothbrush on three occasions. Dkt. #33-8, pp. 74, 101, 104.

Importantly, plaintiff's response to defendants' statement of undisputed facts filed pursuant to Loc. R. Civ. P. 56(a)(2) cites the logbook and states, in part:

> Plaintiff **agrees** that August 18, 2017, is the **first** notation in the logbook that indicates that Plaintiff was given soap, water, and a towel to wash himself [and] August 29, 2017 was the **first** time that the logbook indicates Plaintiff was allowed to brush his teeth.

Dkt. #46-1, p. 8 (emphasis added).[4]

Inmates on contraband watch do not receive recreation time, phone calls, or mail, and they do not attend religious services. Dkt. #33-3, p. 9; Dkt. #45-6, p. 24; Dkt. #33-6, p. 12. However, plaintiff—who is Muslim—was visited twice during the watch by an imam. Dkt. #33-8, pp. 53, 67.

The contraband watch policy is set forth in a "New York State Corrections and Community Supervision" directive titled "Control of & Search for Contraband." Dkt. #33-9. A section titled "Drug & Special Watches – Temporary Isolation" applies to "those circumstances requiring temporary isolation of an inmate when there is 'probable cause'

---

[4] Plaintiff cites the logbook as Exhibit H to defendants' motion for summary judgment, but it is Exhibit G. Dkt. #33-8.

to believe that the inmate has either ingested a contraband item or inserted a contraband item into the rectal cavity." Dkt. #33-9 at p. 14.

This directive further states:

> e. The inmate shall remain isolated for a period not to exceed 48 hours *unless*:
>
> (1) A defecation containing contraband occurs, in which case the inmate will be retained until two negative defecations occur; or
>
> (2) *Two negative defecations do not occur within 48 hours, in which case the inmate will be retained until two negative defecations occur;* or
>
> (3) A radiological detection search conducted pursuant to Section III-1 of this directive indicates the presence of a contraband item which remains in the inmate's body. In this case, the temporary isolation may continue for up to seven days with the written approval of the Superintendent or designee.

Dkt. #33-9, p. 15 (emphasis added).

Defendant Paul Chappius, Jr., who was Superintendent of the Elmira facility, testified that, if the inmate does not produce two negative defecations within 48 hours, or if the jail has evidence that the inmate is still withholding the contraband, the watch may be extended on a case-by-case basis. Dkt. #45-6, pp. 19-24. He also testified that while a sixty-one-day contraband watch is unusual, it was necessary here because repeated x-rays showed that the metal object was still in plaintiff's rectal area. Dkt. #45-6, pp. 29-32. In this regard, Chappius relied on the doctors' assessment of what the x-rays depicted. Dkt. #45-6, p. 36. Chappius testified that there was "no way" he could

release an inmate into the general population knowing that he had a weapon. Dkt. #45-6, p. 32.

Similarly, defendant Lieutenant Timothy Carroll testified:

> The facility has an obligation to have a safe working environment. So, if somebody may have had, let's say, an x-ray that shows they have serious contraband within their system, and they've been able to keep that in their system, I would say a safe, secure working environment could dictate that it may take quite a while for an [inmate] to stay within a contraband watch.
>
> . . .
>
> We would seek some discretion . . . to keep the [inmate] within the confines of the contraband watch if we are confident that the [inmate] has serious contraband secreted that was capable of causing something like death, or serious physical injury, to an employee and/or another incarcerated.

Dkt. #33-4, pp. 9-10.

Upon placement on contraband watch, plaintiff was served the standard inmate diet of breakfast, lunch, and dinner. *See, e.g.,* Dkt. #33-8, pp. 2, 4, 6-7, 9-10, 12, 15-16. Defendant Gregory Keller confirmed that inmates on contraband watch receive the same food as general-population inmates unless there is a medical order. Dkt. #33-3, pp. 3-4, 9; Dkt. #33-5, p. 23.

During the sixty-one-day contraband watch, plaintiff was visited by medical staff on all but three days, often more than once a day. Dkt. #45-7, pp. 2-14. Defendant Chappius testified that the physical and mental health of an inmate on contraband watch

are always concerns, and that such concerns are addressed by the medical monitoring. Dkt. #45-6, pp. 59-62.

On August 12, 2017, a nurse dispensed plaintiff's medications to him. Dkt. #45-7, p. 1; Dkt. #33-8, p. 25.

Additional x-rays of plaintiff were ordered on August 8 and 17, 2017, but he refused to allow them to be taken. Dkt. #33-8, p. 13; Dkt. #34-1, pp. 7-8, 16, 21; Dkt. #45-1, p. 45.

During the attempted x-ray on August 17, 2017, plaintiff was allegedly belligerent with the x-ray technicians and refused to remove his shirt in front of a female technician because it was against his Muslim beliefs. Dkt. #45-1, p. 70. Defendant Sergeant Steven Paciorek, who escorted plaintiff to the medical department, testified that he called the facility imam, and the imam said it was not a problem unless plaintiff was asked to remove his pants. Dkt. #33-5, pp. 31-32. Paciorek relayed this information to plaintiff, but plaintiff remained belligerent and said "fuck you" and "go fuck yourself" to the male technician. Dkt. #33-5, p. 32.[5]

Paciorek placed plaintiff back in restraints to return him to the watch room, and as they got to the second floor, plaintiff began yelling and threatening Paciorek, saying "you are all fucked up with these cuffs and I'll kick all of your fucking asses." Dkt.

---

[5] Plaintiff does not deny that he refused the x-ray but he denies saying "fuck you" or "go fuck yourself." Dkt. #45-1, p. 70.

#33-5, pp. 32-33. Sergeant Paciorek wrote an Inmate Misbehavior Report ("IMR") citing plaintiff for creating a disturbance, verbal harassment, and threats. Dkt. #33-11, p. 10; Dkt. #45-1, p. 75.

### *August 21, 2017: Dr. Ott Places Plaintiff on a Three-Day Full Liquid Diet*

Dr. Kevin Ott, a medical specialist at Elmira, examined plaintiff on August 21, 2017. Dkt. #34, ¶¶ 1, 4; Dkt. #34-1, p. 19. Dr. Ott noted that plaintiff had not had a bowel movement since he was placed on watch on August 4, and that plaintiff stated that he had not been eating or drinking much. *Id.* Dr. Ott suspected that plaintiff was limiting his food and water intake to avoid having a bowel movement due to the suspected contraband, and he discussed with plaintiff the dangers of doing so. *Id.*

Plaintiff agreed to undergo another x-ray and to try a full liquid diet if the x-ray did not reveal any gross abnormalities. *Id.*; Dkt. #34-1, p. 17. The x-ray again showed a metallic object in plaintiff's rectum "with marked retained feces." Dkt. #34, ¶ 5; Dkt. #37, p. 3.

Dr. Ott therefore ordered that plaintiff be placed on a "full liquid diet" for three days. Dkt. #34-1, pp. 4-6. A "full liquid diet" includes juice, soup, broth, Jell-O, and Ensure, but no solid food. Dkt. #34, ¶ 6. Dr. Ott testified that this diet was "meant to address the dangers associated with intentionally withholding bowel movements, which include worsening constipation, pain, megacolon, infection, and developing an ileus, which could result in the need for surgical intervention." *Id.*

On August 22, 2017, plaintiff defecated twice but no contraband was found. Dkt. #35, ¶ 4; Dkt. #33-8, p. 70.

That same day, plaintiff pushed his metal bed frame around his cell, creating a screeching sound. Dkt. #35, ¶ 5; Dkt. #35-2, p. 1. Defendants contend that plaintiff also stood the bed on one end and let it drop, creating a "loud bang." *Id.* Plaintiff testified that he did push the bed around his cell, but he denies dropping the bed. Dkt. #45-1, p. 81. Defendant Kyle Ramirez, a Contraband Watch Officer, issued plaintiff an IMR for creating a disturbance. Dkt. #33-13, p. 5.

Defendant Charles Rumsmoke, the Administrative Sergeant, responded to this incident and testified that he had "no idea" why plaintiff was pushing the bed around, but that he was told to stop multiple times. Dkt. #33-6, pp. 5, 23-26. Rumsmoke ordered Ramirez to remove the bed frame from the cell but to leave the mattress. Dkt. #35, ¶ 5.

On August 25, 2017, plaintiff resumed a regular diet. Dkt. #45-7, p. 8.

### ***Plaintiff Undergoes Further X-rays and a Second Liquid Diet***

Dr. Ott continued to monitor plaintiff and visited him at the watch room on August 22, 29, 31 and September 6. Dkt. #33-1, ¶ 18; Dkt. #33-8, pp. 70, 75, 81, 101. On August 29 and 31, plaintiff refused Dr. Ott's requests that he undergo further x-rays. Dkt. #34 ¶ 7; Dkt. #33-8, pp. 75, 81.

On September 6, Dr. Ott ordered that plaintiff be placed back on a full liquid diet to address his constipation. Dkt. #45-8, pp. 1, 3.

On September 13, plaintiff underwent another x-ray, and it again showed the foreign body in his rectum. Dkt. #37, p. 4; Dkt. #34-2, p. 3.

On September 25, Dr. Ott saw plaintiff and continued to speak with him regarding the dangers of stool withholding. Dkt. #34, ¶ 10; Dkt. #34-1, p. 20. Dr. Ott noted that plaintiff was on a full liquid diet but had been "titrating" his intake to avoid a bowel movement. *Id.* Dr. Ott decided to continue plaintiff on the full liquid diet to limit hard stools and encourage him to have a regular bowel movement. *Id.* Dr. Ott's progress notes of the visit state: "Current presumption is inmate withholding stool so the metallic foreign body cannot be confiscated." Dkt. #34-1, p. 20.

Plaintiff had another x-ray on September 27, 2017, which again showed the foreign object in his rectum. Dkt. #37, p. 5; Dkt. #34-2, p.4; Dkt. 34, ¶ 11. Dr. Ott repeated the dangers of stool withholding, including permanent colon damage. *Id.* Dr. Ott recommended that plaintiff remove the object from his rectum. Dkt. #45-8, p. 5.

On October 2, Dr. Ott again spoke to plaintiff about the dangers of stool withholding. Dkt. #45-8, p. 5. Dr. Ott's progress notes state: "Inmate states that he will

stop withholding stool if regular diet resumes." Dr. Ott agreed to remove plaintiff from the liquid diet that day. *Id.*; Dkt. #45-7, p. 13

On October 4, plaintiff had a large bowel movement in the morning, and no contraband was found. Dkt. #33-8, p. 188; Dkt. #45-7, p. 14. Shortly thereafter, plaintiff was taken for another x-ray, which was negative for the foreign object. Dkt. #37, p. 6; Dkt. #34-2, p. 5; Dkt. #34, ¶ 14; Dkt. #45-7, p. 14. Plaintiff was released from contraband watch that afternoon. Dkt. #45-7, p. 14; Dkt. #33-8, p. 189.

Plaintiff filed this action on May 5, 2020, alleging three claims under 42 U.S.C. § 1983: (1) cruel and unusual punishment; (1) a due process violation; and (3) First Amendment retaliation. Dkt. #1.

## ANALYSIS

### *Summary Judgment Standard*

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "In reaching this determination, the court must assess whether there are any material factual issues to be tried while resolving ambiguities and drawing reasonable inferences against the moving party." *Thomas v. Irvin*, 981 F. Supp. 794, 798 (W.D.N.Y. 1997) (internal citations omitted).

A fact is "material" only if it has some effect on the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see Catanzaro v. Weiden*, 140 F.3d 91, 93 (2d Cir. 1998). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991).

Once the moving party has met its burden of "demonstrating the absence of a genuine issue of material fact, the nonmoving party must come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely upon a 'metaphysical doubt' concerning the facts, or on the basis of conjecture or surmise." *Bryant*, 923 F.2d at 982 (internal citations omitted). A party seeking to defeat a motion for summary judgment

> must do more than make broad factual allegations and invoke the appropriate statute. The [party] must also show, by affidavits or as otherwise provided in Rule 56 of the Federal Rules of Civil Procedure, that there are specific factual issues that can only be resolved at trial.

*Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

### ***42 U.S.C. § 1983***

Plaintiff alleges claims pursuant to 42 U.S.C. § 1983 for the alleged deprivation of his rights under the First, Eighth, and Fourteenth Amendments to the U.S. Constitution. In relevant part, Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ..., subjects, or causes to be subjected, any citizen of

the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

42 U.S.C. § 1983. "Section 1983 'is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred.'" *Matthews v. City of New York*, 889 F. Supp.2d 418, 428-29 (E.D.N.Y. 2012) (quoting *Graham v. Connor,* 490 U.S. 386, 393–94 (1989)).

"To state a claim under Section 1983, a plaintiff must allege that "(1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States." *Id.* at 429 (citation and internal quotations omitted).

### ***Admissibility of the Declaration of Dr. Kevin Ott***

Plaintiff argues that the declaration of Dr. Kevin Ott must be excluded because defendants did not disclose Dr. Ott as a witness in their Rule 26 exchanges. Dkt. #46, p. 7.

Defendants concede that they did not name Dr. Ott in their Rule 26 disclosures. Dkt. #48, p.4. They argue, however, that Dr. Ott's role in plaintiff's care at Elmira was plainly shown in his DOCCS medical records, which defendants provided to plaintiff's counsel early in this litigation. *Id.* at p. 5. Defendants further note that their Rule

26 disclosures specifically stated that "any and all correctional and medical personnel identified in plaintiff's medical record, grievances or correctional records may provide testimony and information to support Defendants' defenses to plaintiff's claims and as to their involvement with regard to plaintiff's claims." Dkt. #45-10, p. 1.

"Rule 26(a)(1) requires a party to disclose the name and contact information 'of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment.'" *Muflahi v. Erie Ins. Co.*, 14-CV-128S, 2016 WL 1713061, at *1 (W.D.N.Y.  April 29, 2016) (quoting Fed. R. Civ. P. 26(a)(1)(A)(i)). "This requirement is designed to alert an opposing party of the need to take discovery of the named individuals." *Id.* (citation and internal quotations omitted).

Federal Rule of Civil Procedure 37(c)(1) provides that any "party [that] fails to provide information or identify a witness as required by Rule 26(a) ... is not allowed to use that information or witness to supply evidence on a motion ... unless the failure was substantially justified or is harmless." *Preuss v. Kolmar Lab'ys, Inc.*, 970 F. Supp.2d 171, 174-75 (S.D.N.Y. 2013) (quoting Fed. R. Civ. P. 37(c)(1)).

Despite Rule 37(c)(1)'s self-executing nature, courts have broad discretion in determining whether and how to impose sanctions. *Id.* at 175 (citations omitted). Further, "[p]reclusion of evidence is generally a disfavored action." *Id.* (citations and internal quotations omitted). In determining whether to preclude evidence under Rule

37(c)(1), courts examine: "(1) the party's explanation for the failure to comply with the disclosure requirement; (2) the importance of the testimony of the precluded witnesses; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance." *Id.*

Plaintiff does not dispute that defendants produced plaintiff's DOCCS medical records to plaintiff on May 17, 2021, approximately a year and a half before discovery closed. Dkt. #45-10, p.6; Dkt. #26. Dr. Ott's name appears throughout those records as the primary physician who treated plaintiff at Elmira. Dkt. #34-1, pp. 4-5, 9, 17, 21-22; Dkt. #34-2, pp. 2-4. Indeed, Dr. Ott is specifically identified as the doctor who prescribed plaintiff the liquid diets and ordered his x-rays, events which are at the heart of plaintiff's claims. *Id.* Further, as noted above, defendants stated in their disclosure that they might call as witnesses any medical personnel identified in plaintiff's records. Dkt. #45-10, p. 1.

Thus, "[a]lthough Defendant should have complied more diligently with the discovery rules, its failure to disclose [individuals] as potential witnesses does not warrant the severe sanction of striking their testimony because Plaintiffs were well aware of their identities and the scope of their knowledge." *Preuss*, 970 F. Supp.2d at 177 (citation omitted).

Moreover, Dr. Ott's testimony is highly relevant to the claims and defenses in this case. This weighs against preclusion of his testimony. *Feltenstein v. City of New*

*Rochelle*, No. 14-CV-5434, 2018 WL 3752874, at *8 (S.D.N.Y. Aug. 8, 2018) (citation omitted).

The Court will thus consider Dr. Ott's declaration in conjunction with defendants' motion for summary judgment.[6]

### *Eighth Amendment Conditions of Confinement Claim*

"Confinement in a prison or in an isolation cell is a form of punishment subject to scrutiny under Eighth Amendment standards." *Greathouse v. Meddaugh*, 632 F. Supp. 3d 3, 17 (N.D.N.Y. 2022) (citation and internal quotations omitted). "In order to establish an Eighth Amendment violation, an inmate must show (1) a deprivation that is objectively, sufficiently serious that he was denied the minimal civilized measure of life's necessities, and (2) a sufficiently culpable state of mind on the part of the defendant official[.]" *Id.*

In prison-condition cases, the state-of-mind requirement "is one of deliberate indifference to inmate health or safety." *Trammell v. Keane*, 338 F.3d 155, 162 (2d Cir. 2003) (citation and internal quotations omitted). This standard "must be applied in a way that accounts for the precise circumstances of the alleged misconduct and the competing institutional concerns." *Id.* at 163. The Court thus must consider whether challenged measures were "reasonably calculated to restore prison discipline and

---

[6] Plaintiff's alternative argument that some of Dr. Ott's testimony constitutes inadmissible hearsay, Dkt. #46, pp. 7-8, is moot because the Court relies on Dr. Ott's declaration only as to events he personally observed.

security and, in that purposive context, whether the officials were deliberately indifferent to [plaintiff's] health and safety." *Id.*

"Restraints on an inmate do not violate the [Eighth] amendment unless they are totally without penological justification, grossly disproportionate, or involve the unnecessary and wanton infliction of pain." *Johnson v. Long*, 21-CV-606 (JLS), 2022 WL 932692, at *3 (W.D.N.Y. Mar. 24, 2022) (citations and internal quotations omitted).

Applying these standards, no reasonable jury could find that plaintiff's Eighth Amendment rights were violated.

First, plaintiff was placed on contraband watch because defendants were informed by the Elmira medical staff that an x-ray showed a "razor-type weapon" in plaintiff's rectal cavity. Dkt. #33-10, p. 12. The safety implications of this are obvious, and defendants thus had a penological justification for taking measures to ensure that any such weapon was confiscated before plaintiff was returned to the general population.

In his briefing, plaintiff repeatedly denies "the authenticity of the photographs taken of the x-ray films and of the films themselves," Dkt. #46-1, ¶¶ 9, 16, 20-22, 24, 27, but he proffers no evidence to support that assertion. For example, plaintiff does not dispute that he underwent the x-rays in question, and he offers no facts from which one could infer that the x-rays were fraudulent or unreliable.

It is well established that "a party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Fed. Trade Comm'n v. Moses*, 913 F.3d 297, 305 (2d Cir. 2019) (citation and internal quotations omitted).

Plaintiff's attempt to call into question the authenticity of the specific August 4, 2017 x-ray fails for the same reason. Dkt. #46-1, ¶ 69-70. Plaintiff testified in his deposition that he was x-rayed that day due to his back spasms, Dkt. #45-1, p. 15, 18, and the x-ray film bears that date, plaintiff's name, and his date of birth. Dkt. #37, pp. 1-2. In a similar vein, plaintiff argues that Dr. Ott did not "truly believe" that he was withholding stool." Dkt. #46-1, ¶ 21. This too is mere speculation and raises no triable issue of fact.

Next, even drawing all inferences in plaintiff's favor, plaintiff cannot satisfy either the objective or subjective prong of an Eighth Amendment claim.

### *Objective Prong: Conditions of the Contraband Watch*

While the conditions of plaintiff's contraband watch were stark, they were not so lacking as to deny plaintiff the "minimal civilized measure of life's necessities." *Greathouse*, 632 F. Supp.3d at 17. Plaintiff was provided a smock to wear; he was initially placed on the standard three-meal-a-day diet; he initially had both a bed and mattress; and, as conceded in his Rule 56(a)(2) submission, he was provided water and soap to wash and a toothbrush to brush his teeth, albeit infrequently.

When the bed in the watch room was removed following a disciplinary infraction, most of which plaintiff concedes, defendants left him the mattress. Dkt. #35, ¶ 5. Plaintiff's testimony that he could not "recall" if he had a mattress or not and could not estimate the times when he did or did not have a mattress is too vague to create a triable issue. Dkt. #45-1, p. 26. This is particularly true because plaintiff does not allege that he was unable to get adequate sleep, and he does not dispute the accuracy of the contraband watch log that reflects that plaintiff was observed sleeping for regular periods of time on a mattress or "mat" after August 22, 2017. Dkt. #33-8, pp. 50-190. *Cf. Garraway v. Smith*, 12-CV-924S, 2019 WL 2135479, at *3 (W.D.N.Y. May 16, 2019) (plaintiff's allegation that a filthy and inadequate mattress caused him to suffer sleep deprivation satisfied objective element of Eighth Amendment claim).

Second, while being required to urinate and defecate under observation by the guards was no doubt embarrassing or even humiliating for plaintiff, that is necessary to the purpose of the watch itself: to confiscate contraband and ensure that the inmate does not unknowingly dispose of it. The measure is thus not "totally without penological justification [or] grossly disproportionate" and it does not "involve the unnecessary and wanton infliction of pain." *Johnson*, 2022 WL 932692, at *3.

Plaintiff's Eighth Amendment claim also relies heavily on (1) the duration of his contraband watch, and (2) the liquid diets on which he was placed.

### ***Duration of the Contraband Watch***

A sixty-one-day contraband watch seems lengthy, as several defendants testified, but when the overall period is examined closely, it is not constitutionally suspect.

Once the watch began on August 4, 2017, defendants, in conjunction with Dr. Ott, took measures to encourage plaintiff to relinquish the contraband, which would have ended the watch. Within two weeks of the watch beginning, however, plaintiff twice refused to undergo another x-ray.

When Dr. Ott first examined plaintiff on August 21, it was his medical opinion that plaintiff was limiting his food and water intake to avoiding having a bowel movement. Plaintiff does not dispute that he had not had a bowel movement in the seventeen days between August 4 and 21. Yet, plaintiff states in his counterstatement of facts pursuant to Loc. R. Civ. P. 56(a)(2): "Plaintiff denies telling Dr. Ott that he had not been eating and drinking but instead reported that he was not being given sufficient food or water." Dkt. #46-1, ¶ 15. This raises no triable issue because there is no such evidence.

Dr. Ott's entry for this visit states: [plaintiff] states that he has not been eating much since his arrival in the infirmary, limited liquids as well." Dkt. #34-1, p. 19. There is no testimony from plaintiff that he told Dr. Ott something different than what Dr. Ott based his diagnosis of constipation on—that plaintiff was deliberately limiting his food and liquid intake. A party simply cannot add testimony through their Rule 56(a)(2) statement.

Following Dr. Ott's examination of plaintiff, an x-ray again showed the metal object in plaintiff's rectum. Dr. Ott thus placed plaintiff on a three-day liquid diet to attempt to alleviate his constipation. The next day, plaintiff defecated twice, and no contraband was found, but he refused to undergo further x-rays on August 29 and 31.

Additional x-rays on September 13 and 27 again showed the foreign object in plaintiff's rectum. Finally, on October 4, when plaintiff defecated, no contraband was found, and an x-ray was negative for the contraband, plaintiff was released from the watch.

Thus, viewed in context, the sixty-one days break down into several windows of time demarcated by defendants' discovery of new evidence that plaintiff continued to have a weapon in his rectum, and each time they responded by continuing the watch until the contraband was either recovered or was no longer present in plaintiff's body. The duration of the watch was thus not "totally without penological justification" or "grossly disproportionate." *Johnson*, 2022 WL 932692, at *3.[7]

---

[7] A final note about duration. Plaintiff asserts that "all individuals found to possess contraband in a radiological search must be released after 7 days regardless of whether they continue to have contraband." Dkt. #46-1, ¶ 13. Plaintiff is incorrect because the cited portion of the directive does not apply to plaintiff. Section J.e.(3), quoted above, applies where x-rays are conducted "pursuant to Section III-I of this directive." Dkt. #33-9, p. 15. In turn, Section III-I governs radiological searches that are ordered where there is compelling evidence that an inmate has secreted dangerous contraband in their body. Dkt. #33-9, p 11. Here, the contraband in plaintiff's rectum was discovered through a routine x-ray conducted due to his back pain, not one authorized because he was suspected of possessing contraband. Plaintiff's watch was thus not initiated under section J.e.(3), but rather under J.e.(2).

***Liquid Diets***

Dr. Ott placed plaintiff on two liquid diets during his contraband watch to alleviate his constipation and encourage him to have a bowel movement. The first was a three-day full liquid diet from August 21, 2017 to August 24, 2017. Dkt. #34-1, pp. 4-6. The second was from September 6, 2017 to October 2, 2017, a period of twenty-seven days. Dkt. #45-8, pp. 1, 3; Dkt. #45-7, p. 13.[8]

The fundamental problem with this aspect of plaintiff's Eighth Amendment claim is that the liquid diets were ordered by Dr. Ott, not by defendants. As Superintendent Chappius testified, the decision to place plaintiff on a liquid diet was the doctor's decision, and it did not require Chappius's authorization. Dkt. #45-6, pp. 40-42, 59.

During the sixty-one-day contraband watch, plaintiff was monitored by medical staff on all but three days, often more than once a day. Dkt. #45-7, pp. 2-14. The medical staff's progress notes reflect that plaintiff complained to a nurse about the first liquid diet between August 22 and 25, 2017. Dkt. #45-7, pp. 7-8. Plaintiff also complained to the medical staff about the second full liquid diet on September 23, 2017. Dkt. #45-7, p. 12. Plaintiff also told Dr. Ott on October 2, 2017 that he would stop withholding his stools if could resume a regular diet. Dkt. #45-7, p. 13.

---

[8] Defendants incorrectly state that plaintiff was on a liquid diet for forty-two days. Dkt. #36, p.7. This calculation fails to account for the twelve-day gap between the two liquid diets.

However, plaintiff offers no evidence that these concerns were relayed to defendants. Indeed, while the contraband watch log contains two entries where plaintiff complained about the liquid diet, neither entry shows that any defendant was present. Dkt. #33-8, pp. 72, 159. Thus, even if plaintiff could show that the liquid diets ran afoul of the Eighth Amendment, such a claim would not lie as to defendants. *See, e.g., Joyner v. Greiner*, 195 F. Supp.2d 500, 505-06 (S.D.N.Y. 2002) (prison superintendent who was not personally involved in providing medical care to plaintiff could not be liable on § 1983 claim, and superintendent was entitled to rely on opinions of medical personnel concerning treatment).

Therefore, plaintiff has not produced evidence from which a reasonable jury could find that defendants were responsible for "extreme deprivations" of plaintiff's "basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety." *Long v. Annuci*, 9:17-cv-0916, 2018 WL 4473404, at *7 (N.D.N.Y. July 26, 2018) (citation and internal quotations omitted), report and recommendation adopted, 2018 WL 4473334 (Sept. 18, 2018).

### ***Subjective Prong***

Plaintiff also has raised no genuine dispute of material fact as to whether any defendant possessed the necessary mental state of deliberate indifference.

In *Trammell v. Keane*, 338 F.3d 155, 163-64 (2d Cir. 2003), the Second Circuit made clear that restrictions on the conditions of a prisoner's confinement, including

"onerous, even harsh" ones, will not constitute deliberate indifference where they are "reasonably calculated to restore prison security or discipline" and where defendants do not disregard an excessive risk to the inmate's health or safety.

Defendant Keller authorized plaintiff's placement on contraband watch upon learning of the August 4, 2017 x-ray that showed a metal object in his rectum. Defendants Chappius and Carroll testified that such a weapon posed a grave danger to the safety of staff and other inmates. Dkt. #45-6, pp. 29-32; Dkt. #33-4, pp. 9-10. No reasonable person could conclude that the contraband watch was not reasonably calculated to address this danger.

Further, as in *Trammell*, defendants knew that plaintiff was regularly monitored by medical staff, and defendants thus were "mindful of, not indifferent to, [plaintiff's] health and ensured that his basic 'health or safety' was not at risk." *Trammell*, 338 F.3d at 164.

It will thus be recommended that defendants' motion for summary judgment be granted as to plaintiff's Eighth Amendment claim.

### ***Fourteenth Amendment Due Process Claim***

"To establish a procedural due process violation, a plaintiff must plausibly allege (1) the existence of a property or liberty interest that was deprived and (2)

deprivation of that interest without due process." *Greathouse v. Meddaugh*, 632 F. Supp. 3d 3, 13 (N.D.N.Y. 2022) (citation and internal quotations omitted).

"A prisoner's restricted confinement within a prison does not give rise to a liberty interest, warranting procedural due process protection, unless the conditions and duration of the prisoner's confinement impose[ ] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 14. "Factors relevant to determining whether the plaintiff endured an 'atypical and significant hardship' include the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions and the duration of the disciplinary segregation imposed compared to discretionary confinement." *Id.*

"The Second Circuit has not provided a bright-line rule as to what period of time in segregated confinement implicates a prisoner's constitutional rights." *Id.* However, the Second Circuit has repeatedly held that "restrictive confinements of less than 101 days do not generally raise a liberty interest warranting due process protections, and thus require proof of conditions more onerous than usual." *Id.* (quoting *Davis v. Barrett*, 576 F.3d 129, 133 (2d Cir. 2009)). *See also Javier v. Russo*, 21 CV 7097 (VB), 2023 WL 5532468, at *8 (S.D.N.Y. Aug. 28, 2023) (restrictive confinement of less than 101 days may constitute "atypical and significant hardship" where "the conditions were more severe that the normal" restrictive confinement conditions).

In determining whether an inmate endured an atypical and significant hardship, the Court must "examine the actual circumstances of confinement." *Davis*, 576 F.3d at 134 (citations omitted). Disputes about the conditions of plaintiff's confinement may not be resolved on summary judgment. *Id.* However, when the conditions are uncontested, "a district court [may] resolve the issue of atypicality of confinement as a matter of law." *Id.*

Here, plaintiff has not raised a triable issue as to whether his confinement on contraband watch for sixty-one days constituted an "atypical and significant" hardship compared to other contraband confinements. In fact, plaintiff adduces no evidence as to how his confinement compared to other contraband watches at Elmira.

Plaintiff argues that he was only given his medications (a pain reliever and asthma medicine) on one occasion during his contraband watch. However, this fact implicates the medical staff, not defendants. Plaintiff does not allege that he alerted any defendant to the fact that he was not receiving his medications.

The same is true of the liquid diets. Dkt. #46, p. 8. As discussed, the decision to place plaintiff on the liquid diets was made by Dr. Ott. There is no evidence that any defendant was involved in that decision, authorized it, or was aware of any complaints by plaintiff regarding the diets.

Therefore, plaintiff has adduced no evidence that would allow a reasonable factfinder to conclude that his confinement gave rise to a liberty interest, and this claim fails as a matter of law.

It will thus be recommended that defendants' motion for summary judgment be granted as to plaintiff's due process claim.

### *First Amendment Retaliation Claim*

To plead a First Amendment retaliation claim, an inmate must plausibly allege "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Petion v. Pearson*, No. 3:22-cv-1647, 2023 WL 6050054, at *2 (D. Conn. Sept. 15, 2023) (quoting *Brandon v. Kinter*, 938 F.3d 21, 40 (2d Cir. 2019)). "Courts within the Second Circuit have held that verbal complaints about the conduct of prison officials may constitute protected activity." *Id.* (citation and internal quotations omitted).

The Second Circuit has instructed district courts, however, to "approach prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." *Id.* (quoting *Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015)).

Plaintiff testified in his deposition that while he was on contraband watch, he "complained to every sergeant, officer, demanding that I was in an involuntary inhumane environment." Dkt. #45-1, p. 76. Defendant Rumsmoke also testified that plaintiff complained a lot, including about the conditions of contraband watch. Dkt. #33-6, p. 22. Although plaintiff's allegations about his complaints are generalized, the Court will assume that he made complaints about his confinement of which defendants were aware.

Plaintiff alleges in his complaint that the retaliatory acts were the Inmate Misbehavior Reports issued on August 17, 2017 and August 22, 2017. Dkt. #1, ¶¶ 75-80. The August 17, 2017 IMR arose out of the incident where plaintiff refused to remove his shirt for an x-ray due to the presence of a female technician. Dkt. #45-1, p. 70. It was issued by defendant Paciorek. Dkt. #33-11, p. 10.

The August 22, 2017 IMR arose out of the incident when plaintiff pushed his metal bed around the contraband watch room. Dkt. 45-1, p. 81. It was issued by defendant Ramirez. Dkt. #33-13, p. 5.

However, plaintiff has shown no facts which would support a reasonable conclusion of any causal connection between his complaints and these write-ups, and temporal proximity alone is not enough. *Javier*, 2023 WL 5532468, at *6 ("Aside from the apparent temporal proximity between the complaint and defendants['] purported action, plaintiff has alleged no other facts to support the inference that any conduct by defendants

was motivated by plaintiff's grievance, which is insufficient.") (citation and internal quotations omitted).

The same is true of two new theories plaintiff asserts for the first time in his opposing memorandum. Dkt. #46, pp. 9-10. Plaintiff first argues that his act of pushing his bed around the watch room was "symbolic speech" expressing his frustration with the liquid diet. Putting aside the absence of any evidence that defendant Ramirez interpreted plaintiff's actions as such, this does not advance plaintiff's claim. The Court has already assumed that plaintiff engaged in protected speech, and this new theory still fails on the causation prong. So, too, does plaintiff's new assertion that his refusal to remove his shirt for the August 17, 2017 x-ray was an expression of his religious beliefs protected by the First Amendment. Dkt. #46, p. 10. Plaintiff still shows no evidence of causation, other than temporal proximity.

It will thus be recommended that defendants' motion for summary judgment be granted on this claim.

## CONCLUSION

For the foregoing reasons, it is recommended that defendants' motion for summary judgment (Dkt. #33) be granted.

Therefore, it is hereby ORDERED pursuant to 28 U.S.C. § 636(b)(1) that:

This Report, Recommendation and Order be filed with the Clerk of the Court.

ANY OBJECTIONS to this Report, Recommendation and Order must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed. R. Civ. P. 72(b) and Local Rule 72(b).

The district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not presented to the magistrate judge in the first instance. *See, e.g., Patterson-Leitch Co. v. Massachusetts Mun. Wholesale Electric Co.*, 840 F.2d 985 (1st Cir. 1988).

Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 72(b) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." Failure to comply with the provisions of Rule 72(b) may result in the District Judge's refusal to consider the objection.

The Clerk is hereby directed to send a copy of this Report, Recommendation and Order to the attorneys for the parties.

**SO ORDERED.**

DATED:        Buffalo, New York
              November 6, 2023

                                         _s/ H. Kenneth Schroeder, Jr._
                                         **H. KENNETH SCHROEDER, JR.**
                                         **United States Magistrate Judge**